## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## CAMDEN DIVISION

————————————————————

AMAZING FISHSTORE LLC d/b/a KRMS )
FARMS and WILDER MEDIA CT, )
on behalf of themselves and all others )
similarly situated, )
                               )
          Plaintiffs, )
                               )
v. ) Case No.
                               )
TD BANK, N.A., )
                               )
          Defendant. )

————————————————————

## CLASS ACTION COMPLAINT

Plaintiffs Amazing Fishstore LLC d/b/a KRMS Farms ("KRMS Farms") and Wilder Media CT ("Wilder Media") (collectively "Plaintiffs"), on behalf of themselves and the classes of businesses preliminarily defined below, bring this Class Action Complaint against Defendant TD Bank, N.A. ("TD" or "TD Bank") as follows:

## INTRODUCTION

1.      This is a civil action seeking monetary damages, restitution, and declaratory relief from Defendant TD Bank ("TD" or "Bank") arising from the unfair and improper assessment and collection of overdraft fees ("OD Fees") and insufficient funds fees ("NSF Fees"). First, TD Bank improperly assesses overdraft fees on debit card transactions that did not overdraw an account. Second, TD Bank improperly assesses more than one NSF or OD Fee on the same item.

2.      These practices breach contractual promises made in TD's contracts.

3.      TD's business customers have been injured by TD's improper practices to the tune of millions of dollars taken from their accounts in violation of their agreements with TD.

4.      On behalf of themselves and the proposed classes, Plaintiffs seek damages, restitution, and injunctive relief for Defendant's violations as set forth more fully below.

## PARTIES

5.      Plaintiff KRMS Farms is a limited liability company based in Southwest Ranches, Florida.

6.      Plaintiff Wilder Media CT is a sole proprietorship based in Ridgefield, Connecticut.

7.      Defendant TD Bank is an American national bank and subsidiary of the Canadian multinational Toronto-Dominion Bank. TD is headquartered in Cherry Hill, New Jersey. TD has approximately 1,300 branches and 1,900 ATM machines in the United States. By assets, TD is now ranked in the top 10 among U.S. banks and provides banking services to 6,500,000 east coast customers from Maine to Florida.

8.      TD Bank has 242 branches in New Jersey and provides banking services to over 12% of the state's bank customers.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter presented by this Class Action Complaint because it is a class action arising under the Class Action Fairness Act of 2005 ("CAFA"), which explicitly provides for the original jurisdiction of the federal courts of any class action in which any member of the class is a citizen of a state different from any defendant, and in which the matter in controversy exceeds in the aggregate sum of $5,000,000, exclusive of interest and costs.

10.      The total claims of members of the proposed class in this action are in excess of $5,000,000 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. §§

1332(d)(2) and (6). Plaintiffs are citizens of Florida and Connecticut, whereas Defendant is a citizen of New Jersey for purposes of diversity. The proposed classes will include consumers from many states. Therefore, diversity of citizenship exists under CAFA as required by 28 U.S.C. § 1332(d)(2)(A). Furthermore, most of the members of the proposed classes are citizens of a state other than New Jersey, where this action is being filed, and the total number of members of the proposed class is greater than 100, pursuant to 28 U.S.C. § 1332(d)(5)(B).

11.     Venue is proper in the District of New Jersey pursuant to the facts described above which include the presence of the TD Bank headquarters, hundreds of bank branches, and hundreds of thousands of customers in this District.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

## I.    TD CHARGES OD FEES ON TRANSACTIONS THAT DO NOT ACTUALLY OVERDRAW THE ACCOUNT

### A.    Overview of Claim

12.     TD issues debit cards to its business account customers, including Plaintiffs, which allow its customers to have electronic access to their checking accounts for purchases, payments, withdrawals, and other electronic debit transactions.

13.     Pursuant to its contracts and other account documents, TD charges fees for debit card transactions that purportedly result in an overdraft.

14.     Plaintiffs bring this cause of action challenging TD's practice of charging OD Fees on what are referred to in this complaint as "Authorize Positive, Purportedly Settle Negative Transactions" ("APPSN Transactions").

15.     Here's how it works. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, TD immediately reduces accountholders' checking account balances by the amount of the purchase, purports to set aside funds to cover

that transaction, and the accountholder's displayed "available balance" reflects that subtracted amount. As a result, customers' accounts will always have sufficient available funds to cover these transactions because TD has already sequestered these funds for payment.

16.     However, TD still assesses crippling OD Fees on many of these transactions and mispresents its practices in its contracts and other account documents.

17.     Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, TD later assesses OD Fees on those same transactions when they purportedly settle days later into a negative balance. These types of transactions are APPSN Transactions.

18.     TD maintains a running account balance in real-time, tracking funds accountholders have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, TD sequesters the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the accountholder, and such funds are specifically associated with a given debit card transaction.

19.     That means when any *subsequent*, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for any earlier debit card transactions. Thus, many subsequent transactions incur OD Fees due to the unavailability of the funds sequestered for those debit card transactions.

20.     Still, despite keeping those held funds off-limits for other transactions, TD improperly charges OD Fees on the APPSN Transactions, although the APPSN Transactions *always* have sufficient available funds to be covered.

21.     The Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> A financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive. At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, Winter 2015 "Supervisory Highlights." Thus, for at least several years, TD has been aware that the practice challenged in this case was deemed unfair by United States banking regulators.

22.     There is no justification for this improper practice, other than to maximize TD's OD Fee revenue. APPSN Transactions only exist because intervening checking account

transactions supposedly reduce an account balance. But TD is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year. But TD is not content with these millions in OD Fees. Instead, it seeks to seize millions *more* in OD Fees by also assessing fees on APPSN Transactions.

23.     Besides being unfair and unjust, these practices breach contractual promises made in TD's adhesion contracts—contracts which fail to inform accountholders about, and in fact misrepresent, the true nature of TD's processes and practices. These practices also exploit contractual discretion to gouge accountholders.

24.     In plain, clear, and simple language, the checking account contract documents covering OD Fees promise that TD will only charge OD Fees on transactions that have insufficient funds to "cover" that debit card transaction.

25.     In short, TD is not authorized by contract to charge OD Fees on transactions that have not overdrawn an account, but it has done so and continues to do so.

**B.    Mechanics of a Debit Card Transaction**

26.     A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from TD. When a merchant physically or virtually "swipes" a customer's debit card, the credit card terminal connects, via an intermediary, to TD, which verifies that the customer's account is valid and that sufficient available funds exist to "cover" the transaction amount.

27.     At this step, if the transaction is approved, TD immediately reduces the balance of funds in the customer's account by the amount of the transaction and sequesters funds in the amount of the transaction but does not yet transfer the funds to the merchant.

28.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 22, 2009). TD Bank does not adhere to this understanding of debit holds, but rather fails to sequester the held funds and thus allows the approved debit card transaction to be assessed an OD Fee.

29.     Usually one to three business days after the hold has been instituted, funds in the amount of the approved transaction are actually transferred from the customer's account to the merchant's account.

30.     TD (like all credit unions and banks) decides whether to "pay" debit card transactions at authorization. After that, TD is obligated to pay the transaction no matter what. For debit card transactions, that moment of decision can only occur at the point of sale, at the instant the transaction is authorized or declined. It is at that point—and only that point—when TD may choose to either pay the transaction or decline it. When the time comes to actually settle the transaction, it is too late—the financial institution has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand,

regardless of other account activity. *See* Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

31.     There is no change—no impact whatsoever—to the available funds in an account when this step occurs.

### C.     TD's Account Documents

32.     Plaintiffs have TD business checking accounts, which are governed by TD's business account contract and other account documents (collectively, the "Account Documents").

33.     Among the Account Documents which govern Plaintiffs' relationships with TD is a document entitled *Business Deposit Account Agreement* ("Account Agreement") which has been attached hereto as **Exhibit A**.

34.     The Account Agreement states in pertinent part that TD uses the available balance to determine when overdrafts occur, and when an accountholder uses a debit card, funds are deducted to cover those purchases:

> When you use a debit card, ATM card, or other electronic means to make withdrawals, we may receive notice of the transaction before it is actually presented to us for payment. That notice may be in the form of a merchant authorization request or other electronic inquiry. Upon receipt of such notice, we treat the transaction as "pending" at the time we receive notice, and subject to certain exceptions, we deduct the amount of the pending transactions from your available Account balance to determine the amount available to pay other items presented against your Account.

*See* Account Agreement, p. 16.

35.     The Account Agreement further clarifies that an available balance is reduced for debit card transactions that have been authorized:

> [T]he total amount of any "pending" debit card, ATM and electronic transactions that have been authorized but not presented to us for payment is deducted from your available Account balance. When you use a debit card, or other electronic

means to make withdrawals, we may receive notice of the transaction before it is actually presented to us for payment. That notice may be in the form of a merchant authorization request or other electronic inquiry. Upon receipt of such notice, we treat the transaction as "pending" at the time we receive notice, and subject to certain exceptions, we deduct the amount of the pending transactions from your available Account balance to determine the amount available to pay other items presented against your Account.

*Id.* at 14.

36.     The Account Agreement further clarifies that it is the moment when TD decides where to "refuse to pay" a debit card transaction is dispositive for overdraft purposes:

We May Refuse to Pay a Check or Other Item Which: a) is illegible; b) is drawn in an amount greater than the amount of funds then available for withdrawal in your Account (see the Funds Availability Policy) or which would, if paid, create an overdraft[.]

*Id*. at 17.

37.     In April, 2021, TD made a further clarification to its Account Agreement to stress that pending debit holds could cause *other* transactions to incur overdraft fees:

Overdraft fees are not charged on "pending" transactions, although pending transactions reduce your available Account balance to pay other transactions and may result in the assessment of overdraft fees for those transactions.

*Id.* at 15.

38.     For APPSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always funds to cover those transactions—yet TD assesses OD Fees on them anyway.

39.     The above promise means that transactions are only overdraft transactions when they are authorized into a negative account balance. Of course, that is never true for APPSN Transactions.

40.     APPSN Transactions are always initiated at a time when there are sufficient available funds in the account.

9

41.    In fact, TD actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to settle those same transactions. Instead, it uses a posting process described below.

42.    All the above representations and contractual promises are untrue. In fact, TD charges OD Fees even when sufficient funds exist to cover transactions that are authorized into a positive balance. No express language in any document states that TD may impose OD Fees on any APPSN Transactions.

43.    The Account Documents misstate TD's true debit card processing and overdraft practices.

44.    First, and most fundamentally, TD charges OD Fees on debit card transactions for which there are sufficient funds available to cover the transactions, despite contractual representations that TD will only charge OD Fees on transactions with insufficient available funds to cover a given transaction.

45.    TD assesses OD Fees on APPSN Transactions that **_do_** have sufficient funds available to cover them throughout their lifecycle.

46.    TD's practice of charging OD Fees even when sufficient available funds exist to cover a transaction violates a contractual promise not to do so. This discrepancy between TD's actual practice and the contract causes accountholders like Plaintiffs to incur more OD Fees than they should.

47.    When a debit card transaction is authorized for APPSN Transactions, sufficient funds are sequestered from the account immediately, consistent with standard industry practice.

48.     Because these withdrawals take place upon initiation, these sequestered funds should not be used later to pay other transactions or fees assessed by the Bank. But that is what TD does when it utilizes sequestered funds during its batching posting process.

49.     In reality, TD's actual practice is to essentially run the same debit card transaction twice to determine if the transaction overdraws an account—both at the time a transaction is authorized and later at the time of settlement.

50.     At the time of settlement, however, an available balance *does not change at all* for these transactions previously authorized into good funds. As such, TD cannot then charge an OD Fee on such transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

51.     Upon information and belief, during its nightly batch posting process, TD releases the sequestered funds held for an APPSN Transaction and allows these funds to be used for other transactions, despite the fact that its Account Documents do not properly disclose this process.

52.     This undisclosed step allows TD to charge OD Fees on transactions that never should have caused an overdraft—transactions that were authorized into sufficient funds, and for which TD specifically set aside money to pay them.

53.     This discrepancy between TD's actual practices and the contract causes accountholders to incur more OD Fees than they should.

54.     In sum, there is a huge gap between TD's practices as described in the Account Documents and TD's practices in reality.

### D.    TD Abuses Contractual Discretion

55.    TD's treatment of debit card transactions to charge OD Fees is more than a breach of the express terms of the Account Documents. In addition, TD exploits contractual discretion to the detriment of accountholders when it uses these policies.

56.    Moreover, TD uses its contractual discretion to cause APPSN Transactions to incur OD Fees by knowingly authorizing later transactions that it allows to consume available funds previously sequestered for APPSN Transactions.

57.    TD uses these contractual discretion points unfairly to extract OD Fees on transactions that no reasonable accountholder would believe could result in OD Fees.

### F.    Plaintiffs' Debit Card Transactions

58.    Plaintiffs were improperly assessed overdraft fees in the above manner on numerous occasions.

59.    As an example, in September, 2021, Plaintiff KRMS Farms was assessed OD Fees for debit card transactions that settled on that day, despite the fact that positive funds were deducted from its available balance immediately when the transactions were authorized prior to that day. TD received notice of the transactions at the moment of authorization and deducted the authorized amount from Plaintiff KRMS Farms' available balance. The debit card transactions for which it was assessed OD Fees were authorized by TD Bank three or fewer days prior to the day they settled.

60.    Plaintiff Wilder Media was also assessed OD Fees for debit card transactions that settled on certain day, despite the fact that positive funds were deducted from its available balance immediately when the transactions were authorized prior to that day.

## II.    <u>TD CHARGES MORE THAN ONE NSF FEE ON THE SAME ITEM</u>

61.     As alleged more fully herein, TD Bank's Account Documents allow it to take certain steps when a TD Bank accountholder attempts a transaction but does not have sufficient funds to cover it. Specifically, the Bank may charge a *single* $35 OD Fee or charge a *single* $35 NSF Fee.

62.     In contrast to its Account Documents, however, TD Bank regularly charges multiple NSF Fees and/or OD Fees on the *same* item.

63.     Until very recently, TD Bank's Account Documents never disclosed that the Bank undertakes these practices. To the contrary, the Bank's Account Documents indicated that TD Bank would charge only a single fee on an item.

### A.    **Plaintiffs' Experiences**

64.     Plaintiffs were improperly assessed NSF or OD Fees in the above circumstance on multiple occasions.

65.     As an example, January 16, 2020, Plaintiff Wilder Media attempted an ACH payment.

66.     TD Bank rejected payment of that item due to insufficient funds and charged Plaintiff Wilder Media a $35 NSF Fee. Plaintiff Wilder Media does not dispute this initial fee, as it is allowed by the Bank's Account Documents.

67.     Unbeknownst to Plaintiff Wilder Media, however, seven days later, on January 23, 2020, TD Bank processed the same item yet again, again returned it unpaid, and again charged Plaintiff Wilder Media *another* $35 Fee.

68.     In sum, TD Bank charged Wilder Media $70 in fees to process a single ACH payment.

69.     Plaintiff KRMS Farms was also assessed multiple fees to process a single item in violation of the Account Documents.

**B.     The Imposition of Multiple NSF Fees on a Single Item Violates TD Bank's Express Promises and Representations**

70.     The Account Documents—together, the Business Deposit Account Agreement, and the corresponding Business Fee Schedule—provide the general terms of Plaintiffs' relationship with the Bank. Therein TD Bank makes explicit promises and representations regarding how transactions will be processed, as well as when NSF Fees and OD Fees may be assessed.

71.     The fee schedule promised that a single OD or NSF Fee will be assessed per "item"—when in fact TD Bank regularly charges two or more fees per item.

72.     An "item" like a check or ACH transaction, in other words, is a request for payment by an accountholder. It does not become a new "item" when it is later reprocessed by TD Bank.

73.     Because, in the example above, Plaintiff Wilder Media only made one request for payment via ACH—it only wanted to pay funds from its account once—there is no new "item" when the ACH is rejected then reprocessed for payment by TD Bank.

74.     In other words, an "item" does not become a new "item" when it is reprocessed.

75.     In sum, the same instruction for payment cannot conceivably become a new "item" each time it is rejected for payment and then reprocessed by TD Bank. The Bank's reprocessing is simply another attempt to effectuate the original order or instruction.

76.     The disclosures described above never address a circumstance where TD Bank may assess one or more NSF Fees *and* an OD Fee on a single check or ACH transaction that was returned for insufficient funds and later reprocessed one or more times.

77.     TD Bank knows this. That is why, in January 2022, TD updated its Business

Account Agreement to state for the first time that the same item could incur multiple fees:

> Please be aware that third parties sometimes re-submit items that we return
> unpaid. Each re-submission constitutes a separate item. You agree that if any
> transaction is submitted for payment again after having previously been returned
> unpaid by us, an Overdraft Fee or Return Item Fee may be assessed each time the
> transaction is submitted for payment and your available balance is insufficient to
> pay the item.

*See* Important Notice About Your Account (Exhibit B hereto).

78.     Indeed, within the last year TD Bank has settled two putative class actions

regarding the Bank's assessment of two or more fees per item in consumer checking accounts.

*See, e.g.*, ECF No. 103 in *Perks v. TD Bank, N.A.*, Case No. 1:18-cv-11176-VEC (S.D.N.Y.)

(preliminary approval order); ECF No. 23 in *Abercrombie v. TD Bank, N.A.*, Case No. 0:21-cv-

61376-JEM (S.D. Fla.) (notice of settlement).   These settlements did nothing to refund or

reimburse TD's business customers which suffered from the same practices.

## CLASS ACTION ALLEGATIONS

79.     Plaintiffs bring this action individually and on behalf of all others similarly

situated pursuant to Rule 23. The Classes are preliminarily defined as:

> All business accountholders that, within the applicable statute of limitations, were
> charged OD Fees on APPSN Transactions in a TD checking account (the
> "APPSN Class").

> All business accountholders that, within the applicable statute of limitations until
> January 30, 2022, were charged more than one NSF Fee on an item in a TD
> checking account (the "NSF Fee Class").

80.     Excluded from the Classes are Defendant, Defendant's subsidiaries and affiliates,

its officers, directors, and members of their immediate families and any entity in which

Defendant has a controlling interest, the legal representatives, heirs, successors, or assigns of any

such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

81.    Plaintiffs reserve the right to modify or amend the definition of the proposed Classes and/or to add classes or subclasses, if necessary, before this Court determines whether certification is appropriate.

82.    The questions here are ones of common or general interest such that there is a well-defined community of interest among the members of the Classes. These questions predominate over questions that may affect only individual class members because TD has acted on grounds generally applicable to the Classes. Such common legal or factual questions include, but are not limited to:

a)    Whether TD improperly charged OD Fees on APPSN Transactions and/or more than one fee on the same item;

b)    Whether the conduct enumerated above violates the contract;

c)    Whether the conduct enumerated above violates the covenant of good faith and fair dealing;

d)    What is the appropriate measure of damages.

83.    The parties are numerous such that joinder is impracticable. Upon information and belief, and subject to class discovery, the Classes consist of thousands of members or more, the identities of whom are within the exclusive knowledge of and can be ascertained only by resort to TD's records. TD has the administrative capability through its computer systems and other records to identify all members of the Classes, and such specific information is not otherwise available to Plaintiffs.

84.    It is impracticable to bring the individual claims of the members of the Classes before the Court. Class treatment permits a large number of similarly situated persons or entities

to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, expense, or the possibility of inconsistent or contradictory judgments that numerous individual actions would engender. The benefits of the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

85.    Plaintiffs' claims are typical of the claims of the other members of the Classes in that they arise out of the same wrongful business practices by TD, as described herein.

86.    Plaintiffs are more than adequate representatives of the Classes in that Plaintiffs are TD business accountholders and have suffered damages as a result of TD's contract violations. In addition:

a)    Plaintiffs are committed to the vigorous prosecution of this action on behalf of itself and all others similarly situated and have retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of accountholders against financial institutions;

b)    There is no conflict of interest between Plaintiffs and the unnamed members of the Classes;

c)    Plaintiffs anticipate no difficulty in the management of this litigation as a class action; and

d)    Plaintiffs' legal counsel have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

87.    Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

88.    TD has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate corresponding declaratory relief with respect to the Classes as a whole.

17

89.     All conditions precedent to bringing this action have been satisfied and/or waived.

## COUNT ONE

### BREACH OF CONTRACT INCLUDING THE
### COVENANT OF GOOD FAITH AND FAIR DEALING
**(Individually and on Behalf of the Classes)**

90.     Plaintiffs repeat and incorporate all of the preceding allegations as if fully set forth herein.

91.     Plaintiffs and all members of the proposed Classes contracted with TD for business checking account services, including debit card services.

92.     TD breached promises made to Plaintiffs and all members of the proposed Classes when, as described herein, TD charged OD Fees as a result of transactions that did not overdraw a checking account, on APPSN Transactions. TD also breached promises when it assessed multiple NSF Fees on the same item.

93.     In addition, there exists an implied covenant of good faith and fair dealing in all contracts that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

94.     Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of

the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

95.     The implied covenant of good faith and fair dealing applies to the performance and enforcement of contracts, limits the parties' conduct when their contract defers decision on a particular term, omits terms, or provides ambiguous terms.

96.     TD has breached the covenant of good faith and fair dealing and abused its discretion in its contract as described herein. Specifically, TD should not have used its discretion to charge OD Fees on APPSN Transactions or multiple fees on the same item. The Account Documents do not provide any basis for TD to charge OD Fees on APPSN Transactions or multiple fees on the same item.

97.     Plaintiffs and all members of the proposed Classes have performed all, or substantially all, of the obligations imposed on them under the contract.

98.     Plaintiffs and all members of the proposed Class have sustained damages as a result of TD's breaches of the contract.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Classes, demand a jury trial on all claims so triable and judgment including the following:

A.     Certification for this matter to proceed as a class action on behalf of the Class;

B.     A declaration that TD's OD Fee and NSF Fee policies and practices are in breach of its contract with accountholders;

C.     Restitution of all OD Fees and NSF Fees improperly seized by TD from Plaintiffs and the members of the Classes as a result of the wrongs alleged herein in an amount to be determined at trial;

D.      Actual damages in an amount according to proof;

E.      Pre-judgment and post-judgment interest at the maximum rate permitted by applicable law;

F.      Reimbursement of costs and legal fees and expenses under the common fund doctrine and all other applicable laws; and

G.      Such other relief as this Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs and all others similarly situated hereby demand trial by jury on all issues in this Class Action Complaint that are so triable.

Dated:  February 23, 2022            Respectfully submitted,

*/s/ Kenneth J. Grunfeld*
Kenneth J. Grunfeld
  New Jersey Bar No. 026091999
**GOLOMB SPIRT GRUNFELD, P.C.**
1835 Market Street
Suite 2900
Philadelphia, PA 19103
Telephone: (215) 985-9177
kgrunfeld@golomblegal.com

E. Adam Webb, Esq.*
  Georgia Bar No. 743910
**WEBB, KLASE & LEMOND, LLC**
1900 The Exchange, S.E.
Suite 480
Atlanta, GA 30339
Telephone: (770) 444-9325
Adam@WebbLLC.com

Jeffrey D. Kaliel*
  D.C. Bar No. 518372
Sophia Gold*
  D.C. Bar No. 701241
**KALIEL GOLD PLLC**
1100 15th Street NW, 4th Floor
Washington, D.C. 20005
Telephone: (202) 350-4783
jkaliel@kalielpllc.com
sgold@kalielgold.com

Andrew Obergfell
Joseph I. Marchese*
Julian C. Diamond*
Matthew A. Girardi*
**BURSOR & FISHER, P.A.**
888 Seventh Ave, Third Floor
New York, NY 10019
Telephone: (646) 837-7150
aobergfell@bursor.com
jmarchese@bursor.com
jdiamond@bursor.com
mgirardi@bursor.com

*Attorneys for Plaintiffs*

* *Pro Hac Vice* Application Forthcoming